929 F.2d 1229
 Prod.Liab.Rep.(CCH)P 12,779
ESTATE OF Mark CAREY, Deceased, by Sharon CAREY, Independent
Administrator, Wannetta Carter, John Gannon, Mary
Anne Gannon, and Paul Gannon,
Plaintiffs-Appellants,
v.
HY-TEMP MANUFACTURING, INC. and Therm-O-Disc, Inc.,
Defendants-Appellees.
 No. 89-1904.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 4, 1990.
Decided April 15, 1991.
Rehearing Denied May 28, 1991.
 
 Edward R. Theobald, Mary M. McCarthy, Chicago, Ill., and Russell J. Luchtenburg, Chicago, Ill., for plaintiffs-appellants.
 James P. DeNardo, Christine L. Olson, Lyndon C. Molzahn, McKenna, Storer, Rowe, White & Farrug, Chicago, Ill. and John Doyle, and Roger W. Wenthe, McDermott, Will & Emery, Chicago, Ill., for defendants-appellees.
 Before WOOD, Jr. and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge.
 
 
 1
 Before us is a strict products liability case arising under diversity jurisdiction, 28 U.S.C. Sec. 1332. The plaintiffs appeal from a jury verdict in favor of the defendant Hy-Temp Manufacturing ("Hy-Temp") and from the grant of a directed verdict in favor of the defendant Therm-O-Disc ("TOD"). We must decide whether the District Court erred in refusing to instruct the jury regarding Hy-Temp's alleged duty to warn of foreseeable dangers and whether the jury could have found that TOD supplied a component part to Hy-Temp according to specifications that were obviously dangerous. The District Court erred on both issues, and we reverse.
 
 FACTUAL BACKGROUND
 
 2
 In the summer of 1981, the plaintiff John Gannon had an energy-saving device, the "Heatnapper," installed on his family's natural gas furnace. The Heatnapper is a heat sensitive vent damper that attaches to the vent pipe between the furnace and the chimney. In its normal position, the damper plate on the Heatnapper is closed. But below the damper plate is a coil made of two types of metal. The two metals have different coefficients of expansion, causing the coil to rotate when it is exposed to sufficient heat. The rotating coil drives a linkage that opens the damper. According to Hy-Temp, when the furnace ignites, the temperature in the flue will rise and cause the damper to open. When the furnace stops, the flue temperature will fall and the damper will close. The Heatnapper is designed to save energy because it prevents the release of heat through the chimney when the furnace is not running.
 
 
 3
 Hy-Temp incorporates a safety device, manufactured by TOD, into the Heatnapper. This device is a switch or disc made of two metals also having different coefficients of expansion. When the disc reaches a certain temperature, it will "snap" and cause the furnace to shut down. The furnace will operate again only after the switch has been manually reset. The Heatnapper, in conjunction with the switch, is designed to function as follows: If for some reason the damper plate fails to open when the furnace ignites, temperatures in the flue will continue to rise. When the heat reaches a sufficient level, the switch will snap and shut off the furnace. When the home has cooled, the residents will contact someone to repair the furnace who will notice the safety switch has tripped and investigate the problem before resetting the switch.
 
 
 4
 On December 19, 1981, all of the plaintiffs were taken to the hospital and were found to be suffering from carbon monoxide poisoning. The plaintiffs claim that the Heatnapper failed to open when their furnace ignited and that the safety switch failed to disengage the furnace. The blocked flue caused the exhaust to recirculate through the furnace consequently generating carbon monoxide gas. The plaintiffs sued both Hy-Temp and TOD claiming that the Heatnapper is unreasonably dangerous. The plaintiffs assert that the damper plate was likely to stick, that the safety switch was calibrated to snap at too high of a temperature, that an additional safety device should have been included on the product, and that Hy-Temp failed to warn consumers that a furnace must maintain minimum flue gas temperatures for a sufficient duration for the Heatnapper to function safely.
 
 
 5
 After hearing all the evidence, the District Court refused to give the question of liability of a component part manufacturer to the jury and directed a verdict in favor of TOD. As to Hy-Temp's liability, the case went to the jury. In instructing the jury of the plaintiffs' allegations against Hy-Temp, the District Court declined to tell the jury of Hy-Temp's alleged duty to warn consumers about flue gas temperatures. The jury returned a verdict for Hy-Temp. The plaintiffs appeal both the jury's and the directed verdict. We reverse.
 
 ANALYSIS
 
 6
 The plaintiffs filed suit in the federal court in Illinois. Because we exercise diversity jurisdiction, we are required to apply Illinois choice of law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the Illinois rule, the place of the injury will supply the governing law unless another state has a more significant relationship to the occurrence or the parties. Pittway Corp. v. Lockheed Aircraft Corp., 641 F.2d 524, 526 (7th Cir.1981). The alleged accident occurred in Illinois, and the parties have correctly assumed that Illinois bears the most significant relationship to the occurrence. We will apply Illinois substantive law.
 
 
 7
 1. The Jury Verdict.
 
 
 8
 The plaintiffs have challenged the District Court's instructions to the jury. They allege the given instruction outlining the issues did not inform the jury of Hy-Temp's duty to warn and that the plaintiffs' proffered instruction should have been given instead. "As a threshold, the proposed instruction must correctly state the law before [the plaintiffs are] entitled to contest the district court's refusal to use it. Moreover, we shall not reverse the court's decision to give or to deny any particular jury instruction unless, " 'considering all the instructions, the evidence and the arguments,' it appears that 'the jury was misled ... [and its] understanding of the issues was seriously affected to the prejudice of the complaining party.' " Northbrook Excess and Surplus Ins. Co. v. Proctor & Gamble Co., 924 F.2d 633, 638 (7th Cir.1991) (citations omitted).
 
 
 9
 The only difference of significance between the given and the rejected instructions is that the latter instructs of the duty to warn.[1] Under Illinois law, a plaintiff may recover from a manufacturer under strict liability in tort based upon the failure to warn of a product's dangerous propensities of which the manufacturer knows or should know. Woodill v. Parke Davis & Co., 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194 (1980). And so, if the evidence would support a finding that Hy-Temp breached a duty to warn of a danger of which it should have known and that the breach proximately caused the plaintiffs injuries, the District Court committed reversible error in not giving the plaintiffs' proposed instruction.
 
 
 10
 The plaintiffs' theory relies on the principle of thermal lag. The Heatnapper's bimetal coil was designed to twist when it reached a certain temperature. TOD's switch was calibrated to snap when it reached 250 degrees. Thermal lag prevents the switch and the coil from immediately operating upon being exposed to the appropriate temperature. Much like preheating an oven, the furnace must expose these devices to the appropriate temperature for a sufficient duration before they will reach the temperature of the surrounding air and function properly.
 
 
 11
 On any given cycle, a furnace will only burn for a few minutes. Due to thermal lag and the brief cycling time, the plaintiffs' expert testified that the Heatnapper with its 250 degree safety switch should not be attached to any furnace that does not maintain flue gas temperatures of at least 370 degrees. Trial Transcript at 354-55. The Heatnapper's inventor testified to an awareness of the problems posed by thermal lag. See Trial Transcript at 1080-83. The flue gas temperatures generated by the Gannon furnace were only 320 degrees. A jury could have found that the Heatnapper is unreasonably dangerous when installed on a furnace emitting flue gas temperatures lower than 370 degrees and that Hy-Temp should have been aware of this danger and should have warned the Gannons.
 
 
 12
 Hy-Temp apparently misunderstands the plaintiffs' theory. Hy-Temp issued an installation manual subsequent to the sale of the Gannon Heatnapper but before the accident that warned the Heatnapper was suitable only for furnaces maintaining flue temperatures between 250 and 590 degrees. See Plaintiffs' Exhibit 30b. It is undisputed that the plaintiffs were not informed of this range. But because the Gannon flue gas temperatures fell within this range, Hy-Temp argues the failure to give this warning could not be the proximate cause of the injury. This argument persuaded the District Court not to give the failure to warn instruction. See Trial Transcript at 1275-76. But the plaintiffs are not claiming they should have been warned of the 250 degree minimum. They are claiming that they should have been warned of a 370 degree minimum. The Gannon furnace generated significantly lower temperatures than 370 degrees, and the jury would have been entitled to find the failure to warn proximately caused the injuries. Even TOD's expert opined that the cause of carbon monoxide buildup in the Gannon home on December 19, 1981, was that the flue gas temperatures
 
 
 13
 "weren't hot enough long enough." Trial Transcript at 1147. Both Hy-Temp and the District Court have misunderstood the plaintiffs' theory. "This case is a classic demonstration of two ships (lawyers for the plaintiff and the trial judge) passing in the night." Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1089 (5th Cir.1986).
 
 
 14
 Evidence thus existed from which the jury could have found liability. And so, the jury should have heard the proposed failure to warn instruction. A new trial is required.
 
 2. The Directed Verdict
 
 15
 The plaintiffs have also appealed the directed verdict granted in favor of TOD. Illinois law governs the standard for directing the verdict. Under Illinois law, a directed verdict should be granted only "when all of the evidence, viewed in its light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand." Horton v. Miller Chem. Co., 776 F.2d 1351, 1355 (7th Cir.1985), cert. den., 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). We conclude the directed verdict was improper and reverse.
 
 
 16
 According to Hy-Temp's specifications, TOD manufactured a component part--the safety switch--that was integrated into the Heatnapper. Manufacturers of component parts made to specifications are liable for injuries caused by the fully assembled product, but only if the component part was in an unreasonably dangerous condition when it left the defendant's control or if the specifications obviously showed the part would become dangerous when integrated into the finished product. See Loos v. American Energy Savers, Inc., 168 Ill.App.3d 558, 119 Ill.Dec. 179, 182-83, 522 N.E.2d 841, 844-45 (1988). No one contends that the safety switch was unreasonably dangerous when it left TOD's control. The dispute is whether the switch, when made to Hy-Temp's specifications, was obviously dangerous.
 
 
 17
 It is undisputed that TOD was aware of the purpose for its switch. A TOD internal memorandum also confirms that TOD knew that carbon monoxide would be generated if both the Heatnapper and the safety switch were to fail. See Plaintiffs' Exhibit 46 ("If for some reason the vent damper failed ... and the 60T manual reset [safety switch] failed ... gases would escape out the draft diverter."). Based upon this, the plaintiffs' expert testified that supplying the switch according to Hy-Temp's specifications rendered the Heatnapper unreasonably dangerous without the presence of another safety device to backstop TOD's switch in case both the Heatnapper failed to open and the switch failed to shut down the furnace. Trial Transcript at 177. Indeed, before the accident, another TOD internal memorandum warns that such a double failure could be a "major liability concern" and that TOD "must refuse to supply without the redundant protection." Plaintiffs' Exhibit 47 (emphasis in original).
 
 
 18
 The jury could have found from this evidence that Hy-Temp's specifications to TOD were obviously dangerous because they failed to provide for redundant protection. The jury could have further found from the plaintiffs' expert's testimony and from the undisputed fact that the plaintiffs suffered carbon monoxide poisoning that this obvious danger was the proximate cause of the plaintiffs' injuries. The directed verdict was improper. The judgment of the District Court is therefore REVERSED and the case is REMANDED for a new trial against both defendants.[2]
 
 
 
 [1]
 The District Court instructed the jury as follows:
 Each of the plaintiffs claim that he or she was injured when he or she was in the Gannon home, in the fall of 1981, and that there existed, in the vent damper, at the time it left the control of the Defendant Hy-Temp Manufacturing, Inc., a condition which made the vent damper unreasonably dangerous, in one or more of the following respects: (a) the vent damper was likely to stick in the closed position; (b) the vent damper failed to open when the burner of the furnace ignited; (c) the vent damper had an inadequate system to shut off the furnace, if the damper failed to open. Each of the plaintiffs further claim that one or more of the foregoing was the proximate cause of his or her injuries.
 Trial Transcript at 1366.
 The plaintiffs requested the jury to be told instead:
 
 
 [1]
 Each of the plaintiffs claims that he or she was injured when he or she was in the Gannon home in the fall of 1981 and that there existed in the vent damper and the heat-sensitive switch a condition which made the vent damper unreasonably dangerous and that Hy-Temp Manufacturing is liable to the plaintiffs in one or more of the following respects:
 a. Hy-Temp Manufacturing designed or manufactured or distributed or sold the vent damper with internal friction surfaces which were likely to stick and prevent proper venting of dangerous gas and without including adequate features which would prevent gas spillage in the event of such sticking; or
 b. Hy-Temp Manufacturing designed or manufactured or distributed or sold the vent damper or the heat-sensitive switch with an actuating assembly that failed to open the damper or shut down a furnace before the spillage of dangerous gasses reached a hazardous level;
 c. Hy-Temp Manufacturing designed or manufactured or distributed the vent damper or the heat-sensitive switch without an adequate fail safe system to shut off the appliance if the damper fails to open, including when there is sticking by the internal friction surfaces, in that the heat-sensitive switch which should automatically shut down the furnace required too long a time for general use and, in general, failed to shut off the furnace when the burner ignited and the vent damper failed to open; or
 d. Hy-Temp Manufacturing designed or manufactured or distributed or sold the vent damper or the heat-sensitive switch without adequate warnings in its instructions pertaining to the proper way to install or use the "heatnapper", including those relating to the flue-gas temperature required to activate the heat-sensitive switch; or
 e. After the vent dampers or safety switches were distributed or sold Hy-Temp Manufacturing became aware of one of the above unreasonably dangerous conditions and failed to inform the Plaintiffs of one or more of the above unreasonably dangerous conditions.
 
 
 [2]
 Each of the plaintiffs further claims that one or more the foregoing was a proximate cause of his or her injuries
 Plaintiffs Instruction No. 20A.
 The main difference between the proposed and the given instruction lies in (1)(d) and (e) of the proposed instruction. Hy-Temp quarrels that the plaintiffs have waived any objection to the given instruction and that the proposed instruction is otherwise argumentative. We are curious how Hy-Temp can argue waiver with a straight face. The record shows the plaintiffs tendered the proposed instruction long before trial and strenuously objected to the given instruction at the instructions conference. See Trial Transcript at 1282-83. See generally United States v. Warner, 855 F.2d 372, 374 (7th Cir.1988) (explaining waiver). As to the argumentative contention, the record shows the proposed instruction was refused because it included the duty to warn. See Trial Transcript at 1266-76. If the evidence supports this theory, the District Court owes an obligation to give the tendered instruction even though its language may not be entirely perfect because it is "an instruction essential to the jury's understanding of the case." Brandes v. Burbank, 613 F.2d 658, 668 (7th Cir.1980).
 
 
 [2]
 The plaintiffs have raised several other issues, most of which challenge evidentiary rulings of the District Court. Because we are remanding for a new trial, we need not decide whether these other issues would independently require a reversal. Each can be decided anew at the second trial
 However, we are troubled by the exclusion of evidence of tests performed on the Heatnapper and of other incidents when the Heatnapper allegedly failed to open. True, in order for these occurrences to be admissible, the plaintiffs must first lay a foundation that the tests or incidents occurred under substantially similar circumstances to those present when the alleged current accident occurred. Nachtsheim v. Beech Aircraft Corp., 847 F.2d 1261, 1268 (7th Cir.1988); Gardner v. Southern Ry. Sys., 675 F.2d 949, 952 (7th Cir.1982) (per curiam). But we caution that "substantially similar" does not mean "identical." The range between similar and identical is a matter to be addressed on cross examination. See Kelsay v. Consolidated Rail Corp., 749 F.2d 437, 450-51 (7th Cir.1984) (Posner, J., dissenting). This range is especially broadened when the similar events are offered to show notice to the manufacturer as opposed to showing a defect in the product. See Nachtsheim, 847 F.2d at 1268 n. 9; Exum v. General Elec. Co., 819 F.2d 1158, 1162 (D.C.Cir.1987); Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1082-84 (5th Cir.1986).
 Additionally, we are concerned about expert testimony in this case. We believe in cross-examining an expert witness, a party should often be afforded latitude to confront the witness with his or her test notes. The District Court is also to remember that expert witnesses may be competent to give opinions based upon hypothetical facts even though a foundation that the expert has personal knowledge of those facts has not been laid. See FED.R.EVID. 703.