67 F.3d 298
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Raul Armando PILOTO, a/k/a Pablo Maldonado, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Raul Armando PILOTO, a/k/a Pablo Maldonado, Defendant-Appellant.
 Nos. 93-5587, 94-5583.
 United States Court of Appeals, Fourth Circuit.
 Sept. 29, 1995.
 
 ARGUED: Marisa Tinkler Mendez, MARISA TINKLER MENDEZ, P.A., Coral Gables, Florida, for Appellant.
 Harry Thomas Church, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.
 ON BRIEF: Marc S. Nurik, MARC S. NURIK, P.A., Fort Lauderdale, Florida, for Appellant. Mark T. Calloway, United States Attorney, Charlotte, North Carolina, for Appellee.
 Before NIEMEYER, Circuit Judge, PHILLIPS, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant-appellant Raul Piloto was convicted of membership in a conspiracy with two objectives: to possess with intent to distribute cocaine and to distribute cocaine. Piloto contends on appeal that the district court reversibly erred in denying his request for a continuance, in admitting certain testimony and evidence, in making several remarks in the course of the trial, in denying his request for particular jury instructions, in enhancing his sentence for his role as a manager in the conspiracy, and in denying his request for a new trial. Piloto also argues that the verdict was not sufficiently supported by the evidence, and that, in closing argument, the prosecutor committed misconduct which prejudiced his right to a fair trial.
 
 
 2
 We find that the district court at all times acted well within its discretion and that the district court's finding that Piloto was a manager was not clearly erroneous. We further find that the evidence was more than sufficient to sustain the conviction, and that the prosecutor's comments during closing argument, while perhaps improper, were not so extreme as to prejudice Piloto's right to a fair trial.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 3
 Raul Piloto was indicted in the Eastern District of North Carolina on October 7, 1992, and charged with conspiracy to possess with intent to distribute cocaine and to distribute cocaine in violation of 21 U.S.C. Secs. 841(a)(1) and 846. Seven days before trial, the government informed the defense, for the first time, that a codefendant, Julian Thomas, had entered a plea agreement and would be the chief witness against Piloto. The defense moved for a continuance, which was denied. The defense was also informed only days before trial that the government had shown its witnesses two photo spreads for pretrial identification purposes, and that only Piloto's picture appeared in both spreads. The defense filed a motion to suppress identification testimony, which was denied without a hearing as untimely, because the cutoff date for motions had already passed.
 
 
 4
 At Piloto's jury trial, the following evidence was presented by the government: Julian Thomas testified that he met Piloto in Miami in 1980, and purchased marijuana and a small amount of cocaine from him between 1980 and 1982. After several of Thomas' customers were arrested, Piloto arranged for a man named Enriko Carballo to forge new identification for Thomas. Thomas continued to purchase marijuana from Piloto until 1987 or 1988.
 
 
 5
 In 1987, Thomas purchased from Piloto between two and three kilograms of cocaine, which Thomas resold to Kenneth Mabe. Thomas began working with Artie Smith in 1988. Thomas and Smith travelled together from North Carolina to Miami, where they met Piloto and exchanged cocaine and money. Thomas began working with J.D. Fox in 1990. In an arrangement unrelated to Thomas' relationship with Smith, Fox was already driving to Florida for Smith to pick up cocaine from Piloto. Fox drove to Piloto in Miami two or three times to procure one kilogram packages of cocaine which Fox and Thomas distributed in North Carolina together. Fox hired Burton Holmes to drive to Miami to retrieve the cocaine at times. Thomas testified that he received a total of between five and six kilograms of cocaine from Piloto between 1987 and 1991.
 
 
 6
 Thomas used several phone numbers for Piloto, a business phone number for Piloto's business, Vestal Glass, and two mobile phone numbers. Thomas testified that he would occasionally mail car license tags to Piloto by express mail for use on cars which would transport cocaine. In February, 1990, Thomas was stopped by a Louisiana state trooper, who removed from Thomas' car an express mail receipt bearing Piloto's address and phone number. Thomas identified Government Exhibit 2 as being that express mail receipt, and identified the handwriting on the receipt as his own.
 
 
 7
 Leland Dwight, a Louisiana state trooper, testified that on February 3, 1990, he searched a vehicle that had been stopped for speeding. Dwight related that he found an express mail receipt in the car. He identified Government's Exhibit 2 as that receipt. The government moved the receipt into evidence.
 
 
 8
 Artie Smith testified that he met Piloto through Julian Thomas in the fall of 1988, and that approximately three months after Smith met Piloto, Smith and Thomas traveled to Miami and collected one kilogram of cocaine and ninety-two pounds of marijuana from Piloto. Smith resold the cocaine in North Carolina to various people, including Larry Busler and J.D. Fox. After selling the kilogram of cocaine, Smith gave $45,000 to Thomas to deliver to Piloto. In 1989 and 1990, Smith drove to Miami another eight or ten times, obtaining a kilogram of cocaine from Piloto each time. Smith would call Piloto on one of the mobile phone numbers previously identified by Thomas as belonging to Piloto, and Piloto would answer at that number. Piloto gave Smith the cocaine, which Smith sold in North Carolina before returning to Miami to pay Piloto. Smith testified that, for approximately six months, he paid J.D. Fox to drive to Piloto in Florida. Fox made four or five trips in total and transported a kilogram of cocaine on each trip. Smith ceased selling cocaine in February or March of 1991.
 
 
 9
 J.D. Fox testified that he had known Artie Smith for twenty-five years. He testified to the same facts previously testified to by Thomas and Smith--e.g., that he had driven to Miami to collect kilogram packages of cocaine from Piloto for Smith and for Thomas, and that the cocaine was distributed in North Carolina to other sellers. Fox also stated that Burton Holmes was another driver and that Larry Busler helped sell the cocaine in North Carolina.
 
 
 10
 Burton Holmes testified that he drove for Fox and Thomas, and Kenneth Mabe testified that he sold cocaine for Thomas. A companion of J.D. Fox, Patsy Simmons, and the brother of Artie Smith, Richard Smith, both testified, and substantially confirmed the testimony of Thomas, Artie Smith, and Fox. All witnesses who had been to Florida to see Piloto positively identified Piloto in the courtroom and positively identified a large house in a government photo exhibit as Piloto's house.
 
 
 11
 The defense presented the following impeachment evidence: Fox stated that Piloto is 56" tall. Defense counsel measured Piloto in the courtroom and Piloto is under 53" tall. When handed a photo spread containing Piloto's picture, Fox misidentified Piloto's picture as being a picture of the government's investigating agent. All of the government witnesses other than the state trooper had pled guilty prior to Piloto's trial and were hoping for substantial assistance motions from the government, which would result in reductions in their sentences. Most had used drugs at various times.
 
 
 12
 The following evidence was presented by the defense in its case-inchief: Agent Jernigan, a government investigator, testified that he searched phone records for one of the mobile phone numbers which Thomas and Fox had testified was Piloto's, and found the account to be in the name of Pablo Maldonado, not Raul Piloto. Alicia Carballo then testified, identifying her late husband, Enriko Carballo, as the man who forged Thomas' identification. Alicia Carballo testified that Enriko and Piloto were friends until Enriko died in 1992, and that Enriko had worked for Piloto at Vestal Glass. Enriko had a mobile phone with the same number given by Thomas as one of Piloto's numbers, the same number found by Agent Jernigan to be listed under the name Pablo Maldonado. Enriko had travelled to North Carolina at least once, after which trip he ripped up his plane tickets and threw them away. Enriko was approximately 57" tall.
 
 
 13
 Fabricio Alfaro, Piloto's wife's cousin, testified that Piloto and his wife visited Alfaro in El Salvador for the months of November and December, 1988. Alfaro also testified that he loaned Piloto the money to build a house in Florida. The defense moved into evidence a receipt from a doctor who had treated Piloto's wife in December of 1988 in El Salvador, and the passports of Piloto and his wife, showing stamps for El Salvador.
 
 
 14
 The government presented rebuttal testimony from the agent who arrested Piloto. The agent testified that he had looked at Piloto's passport at that time, and that it had not contained a stamp for El Salvador.
 
 
 15
 In closing argument, defense counsel argued that 5 7" Carballo was the source of the cocaine, not 53" Piloto. Defense counsel also argued that Piloto was in El Salvador in late 1988, when Smith and Thomas claim to have met with Piloto in Florida.
 
 
 16
 The jury convicted Piloto of the conspiracy charged. The district court sentenced Piloto to 248 months of imprisonment and five years supervised release. The district court based this sentence on a finding that Piloto had been involved in a conspiracy involving between fifteen and fifty kilograms of cocaine, resulting in an initial offense level under the Guidelines of 34, and a finding that Piloto was a manager or supervisor warranting a three-level enhancement, resulting in a total offense level of 37.
 
 
 17
 After sentencing, the government disclosed to defense counsel previously undisclosed evidence that one of the witnesses, Artie Smith, had told a government agent before trial that Smith had paid an employee of the telephone company to destroy the records of all of Smith's long distance calls. The agent had subsequently checked all of the phone records, and none appeared to be missing. The defense moved for a new trial based upon this evidence. The district court denied the motion.
 
 
 18
 Piloto now appeals.
 
 II. DISCUSSION
 
 19
 A. Defendant's Motion for a Continuance.
 
 
 20
 On April 21, 1993, only seven days before the trial, the government informed the defense of its intention to call Thomas, a codefendant, to testify against Piloto in exchange for a substantial assistance motion by the government in Thomas' case. In those seven days, Piloto's attorney found extensive impeachment material regarding Thomas, which the attorney placed before the jury at trial. The defense moved for a continuance on April 26, two days before trial, alleging that an adequate cross-examination of Thomas could not be prepared because all of the potentially-existing impeachment material on Thomas might not be obtained in the time remaining. The district court denied the motion, and Piloto challenges that ruling on appeal.
 
 
 21
 As we explained in United States v. Bakker, "[t]o prove that the denial of [a] continuance constitutes reversible error, [the movant] must demonstrate that the court abused its 'broad' discretion and that he was prejudiced thereby." 925 F.2d 728, 735 (4th Cir.1991) (citing United States v. LaRouche, 896 F.2d 815, 823-25 (4th Cir.), cert. denied, 496 U.S. 927 (1990)). Prejudice in the context of a denial of a continuance would be a showing of the existence of some information which was not produced at trial and which, absent the denial of the continuance, would have been known to the attorney, would have been placed before the jury, and would possibly have changed the outcome of the trial.
 
 
 22
 In the instant case, Piloto has failed to show that he was prejudiced by the denial of a continuance. Piloto and Julian Thomas had known one another for over ten years, and therefore Piloto's attorney had access to extensive information about Thomas, which the attorney used to impeach Thomas' credibility. For example, Piloto's attorney elicited testimony showing (a) that Thomas was testifying pursuant to a plea agreement and expected a "substantial assistance" sentence reduction in exchange for his testimony, (b) that Thomas' lawyer was formerly the supervisor of the U.S. Attorney trying the case against Piloto, (c) that Thomas had lied and changed his name in the past to avoid incarceration, and (d) that Thomas used cocaine. On appeal, Piloto's attorney has not presented any impeachment or other evidence relating to Thomas which Piloto's attorney did not know and place before the jury at trial. In light of the lack of a showing of prejudice, the district court's denial of the request for a continuance does not constitute reversible error.
 
 
 23
 B. Judge's Comments During Voir Dire and Trial.
 
 
 24
 Piloto claims that some of the district court judge's comments during the course of voir dire and trial displayed a prejudice against Piloto and deprived Piloto of a fair trial. Because Piloto's counsel failed to object to the district court's interrogation at any time during trial, we review the district court's actions for "plain error"--that is, we may not reverse unless the district court's comments were " 'so prejudicial as to deny a party an opportunity for a fair and impartial trial.' " Stillman v. Norfolk & W. Ry. Co., 811 F.2d 834, 839 (4th Cir.1987) (quoting Miley v. Delta Marine Drilling Co., 473 F.2d 856, 857-58 (5th Cir.), cert. denied, 414 U.S. 871 (1973)).
 
 
 25
 Piloto claims that the following comments by the trial judge displayed a bias against him: The judge stated during voir dire that this was "another drug conspiracy case" and that although he was sure the members of the venire were "probably opposed to drugs," he needed to know if any jurors belonged to any anti-drug organizations. At the opening of the trial, the judge explained that the government would put on its evidence first, and then "the defense will put on its evidence, if it has any--wishes to put on any evidence." During the defense's case-in-chief, the judge stated that the jury would not sit and wait for the defense to review various records. At the close of the evidence, the judge told the jury to listen to closing arguments closely because "they will call to your attention items which you may not have deemed important, such as telephone numbers and things of that nature, and it will help you tie together the evidence." During jury instructions, the judge read the defendant's name as it appeared in the indictment, "Raul Armando Piloto, also known as Pablo Maldonado--if I got my Spanish right."
 
 
 26
 Before examining each of these statements, we note that trial courts have a duty to assist juries, in particular by "explaining, summarizing, and commenting on the evidence," Seidman v. Fishburne-Hudgins Educ. Found., Inc., 724 F.2d 413, 417 (4th Cir.1984) (citing United States v. Tello, 707 F.2d 85 (4th Cir.1983)). Viewing the comments in context, it is clear that the court told the venire that this was "another drug conspiracy case" in order to inform the venire members about the type of voir dire questions they would be asked. The court's comment that the jurors were "probably opposed to drugs" was calculated to let potential jurors know that they only needed to answer the voir dire question about drugs if they were involved in an anti-drug organization or had particularly strong feelings about the matter--someone who is opposed to the charged crime is not disqualified from a jury for cause unless his or her opposition is so strong that it might render the juror impartial. The "if I got my Spanish right" comment appears to have been a comment on the judge's own ability to pronounce words in Spanish, not a comment on the background of the defendant. In fact, it was Piloto's attorney who emphasized his client's background, by repeatedly stating in closing argument that no matter where someone comes from, he has a right to a fair trial. The phone numbers comment was simply an explanation to the jury, and, in light of the fact that both the defense and the prosecution referred to the phone numbers as evidence of their theory of the case,[1] the comment did not favor either party. Telling an attorney that the jury will not sit and wait while the attorney examines records is not prejudicial, as it is the very function of the judge to move the trial along.
 
 
 27
 When the district court told the jury that the defendant would produce evidence "if [the defendant] has any [evidence]," defense counsel had not yet informed the district court whether or not the defense would be putting on any evidence. The comment was made simply in order to inform the jury that the defendant was not required to put on evidence and might not put on evidence. Although a different phrasing, perhaps stating "if the defendant chooses to put any evidence on," would have been preferable, the single comment here, in context, did not deny Piloto an opportunity for a fair and impartial trial, and thus can not form the basis for a finding of plain error on appeal.
 
 
 28
 In sum, none of the comments complained of amount to plain error. Rather, the district court here was properly performing its duty to assist the jury throughout the case.
 
 
 29
 C. Prosecutor's Comments in Closing Argument .
 
 
 30
 During closing argument, the government commented on the fact that Piloto's wife failed to testify on his behalf, and the fact that Piloto failed to produce his telephone bills from the time period in 1988 when he claimed to have been in El Salvador, as follows:
 
 
 31
 The burden, as we said, remained at our table. The defendant has no obligation to bring in evidence. But one thing stuck out in my mind when we talked about the El Salvador trip.... This defendant's wife set in the courtroom two days.... You didn't hear from her about that trip.... Why didn't she testify?
 
 
 32
 and:
 
 
 33
 Again, this defendant has no burden, but you heard the man testify--the cousin testify that the defendant and his wife made phone calls back from El Salvador. Where are those tolls?
 
 
 34
 Piloto objected at trial to these comments on the ground that they effectively shifted the burden of proof onto him to prove his innocence. The objection was overruled, and Piloto has now raised the same argument on appeal.
 
 
 35
 Prosecutorial misconduct arises when the prosecutor's remarks were (1) improper and (2) "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Brockington, 849 F.2d 872, 875 (4th Cir.1988) (citing United States v. Hernandez, 779 F.2d 456, 458 (8th Cir.1985)). As we have previously explained in reviewing the prejudice prong of the prosecutorial misconduct test,
 
 
 36
 [a] number of factors should be considered when evaluating the issue of prejudice to the defendant: "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters."
 
 
 37
 United States v. Mitchell, 1 F.3d 235, 241 (4th Cir.1993) (quoting United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir.1983), cert. denied, 466 U.S. 972 (1984)).
 
 
 38
 In the instant case, the comments had the potential to mislead the jury to some degree into believing that the defendant bore the burden of calling his wife to the stand and of putting his phone records into evidence, but any such potential to mislead was not great, as both the prosecutor and the judge reiterated several times that the prosecution bore the burden of proof. The prosecutor's remarks were isolated, and, absent the remarks, the evidence produced by the government against Piloto was very strong, as at least five witnesses identified Piloto in the courtroom as the source of cocaine. The comments were deliberately placed before the jury, but not in order to divert their attention to extraneous matters--in fact, the crux of the defense case was that the defendant was in El Salvador during the transaction testified to by Thomas and Smith as having taken place in late 1988. In sum, although the comments themselves may have been improper, their placement in front of the jury is not a ground for reversal here, as no prejudice has been shown.
 
 
 39
 D. Defendant's Motion to Suppress Identification Testimony.
 
 
 40
 Piloto challenges the denial of his pre-trial motion to suppress out-of-court and in-court identification testimony of government witnesses Artie Smith, J.D. Fox, Pat Simmons, Kenneth Mabe, and Burton Holmes, on the grounds that the identification procedure used by the government with these witnesses was unduly suggestive. The witnesses had all been shown two photo arrays, from which the witnesses were asked to identify the defendant. Each array contained pictures of several different people, and the only person whose picture appeared in both arrays was Piloto. The district court denied the motion to suppress as untimely, without considering the merits. In light of the grave danger of prosecutorial overreaching in the use of pre-trial photo array identification procedures, procedures to which the defendant and defense counsel are ordinarily not privy and yet which have the potential to lead to the conviction of one who is innocent, we examine briefly the merits of this issue.
 
 
 41
 It is established law that "convictions based on eyewitness identification at trial following a pretrial identification by photograph, will be set aside ... only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). The Supreme Court in Manson v. Brathwaite, 432 U.S. 98 (1977), set forth a two-part test for determining the admissibility of identification testimony. First, the accused must show that the procedures employed by the police in obtaining a pre-trial identification were unduly or unnecessarily suggestive. Id. at 106. Second, if such a showing is made, the court must determine in light of the totality of the circumstances whether the proposed identification testimony is independently reliable. Id. at 114.
 
 
 42
 Piloto has not established the first element here. The two arrays do not appear to have been unnecessarily suggestive; one array contains a photo of Piloto clean-shaven, and the other contains a photo of him unshaven. As the witnesses saw Piloto at various points in time over a five year period, it was necessary to show them photos of Piloto both shaven and unshaven. Moreover, if the district court had examined the totality of the circumstances, it would certainly have found the identification testimony independently reliable. Every witness had seen Piloto on multiple occasions, and therefore the totality of the circumstances indicates that their in-court identification testimony was reliably based upon their familiarity with Piloto's appearance, rather than their impressions from the photo arrays. Because neither element of the Manson test has been met here, we find no error in the admission of the identification testimony.
 
 
 43
 E. Defendant's Drug Dealings Prior to Indictment Period.
 
 
 44
 Piloto challenges the district court's admission of testimony relating to drug transactions between himself and witnesses Thomas and Mabe prior to the period charged in the indictment, 1987 to 1992. From a review of the record, it appears that Mabe's testimony only pertained to acts within the period in the indictment; therefore only Thomas' testimony is at issue. Piloto claims that such evidence should have been excluded under Rules 404(b) and 403 of the Federal Rules of Evidence.[2] The admission of prior acts evidence is reviewed for an abuse of discretion. United States v. Russell, 971 F.2d 1098, 1104 (4th Cir.1992), cert. denied, 113 S.Ct. 1013 (1993). Rule 404(b) of the Federal Rules of Evidence provides that evidence of other crimes or acts is not admissible to prove character and acts in conformity therewith, but is admissible for other purposes, such as proof of intent, knowledge, and identity. Fed.R.Evid. 404(b). Rule 403 provides that evidence is inadmissible if its probative value is substantially outweighed by its prejudicial effect. Fed.R.Evid. 403. Extrinsic act evidence is admissible when it is "(1) relevant to an issue other than character, (2) necessary, and (3) reliable," United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988) (citations omitted)--for example, "where it 'furnishes part of the context of the crime,' " id. at 1247 n. 4 (quoting United States v. Smith, 446 F.2d 200, 204 (4th Cir.1971)).
 
 
 45
 The testimony at issue involved the entire course of acquaintance between witness Thomas and Piloto. That acquaintance grew out of, and substantially involved, marijuana and cocaine transactions. As explained by the district court in response to a defense objection to the admission of the testimony,
 
 
 46
 this evidence was unrelated to Defendant's character.... It was necessary evidence because it was the only means by which the Government could establish the relationship which eventually developed into the very conspiracy at issue--the longstanding friendship between Defendant and Julian Thomas. The evidence was reliable since it came from a co-conspirator who was, by his testimony, making a statement against his interest by admitting his own involvement in the past drug dealings. Finally, this evidence was not so prejudicial as to implicate [Rule 403] concerns. Hearing evidence that Defendant was a drug dealer prior to the time of the conspiracy is highly unlikely to cause a jury to irrationally convict a Defendant for the copious amount of drug dealing he did within the indictment time period.
 
 
 47
 The district court properly applied the law, and its admission of the prior bad acts evidence was not an abuse of discretion.
 
 
 48
 F. Express Mail Receipt.
 
 
 49
 Piloto claims on appeal that the express mail receipt found by the Louisiana state trooper in Thomas' car with Piloto's name and a phone number on it should not have been admitted into evidence. Piloto argues that the receipt was inadmissible hearsay because it was an out-of-court statement used to prove the truth of the matter asserted (i.e., that the number was in fact Piloto's), and that the receipt was independently inadmissible because it was cumulative and prejudicial. However, we find that the receipt was not hearsay, cumulative, or unduly prejudicial.
 
 
 50
 Under the Federal Rules of Evidence, a coconspirator's statement, made in the course of and in furtherance of the conspiracy, is not inadmissible hearsay. Fed.R.Evid. 801(d)(2)(E). The predicates to admission need be proven by a mere preponderance of the evidence, and a trial court's decision to admit evidence is reviewed for abuse of discretion. Russell, 971 F.2d at 1104. In the instant case, the statement was made by Thomas, a coconspirator, as he testified that the handwriting was his. The statement was made during the course of the conspiracy, and furthered the conspiracy in that express mail packages were used by the coconspirators to send tags back and forth for use on vehicles which were used to transport drugs between Miami and North Carolina. Thus the statement was not inadmissible hearsay.
 
 
 51
 To be inadmissible on the basis of cumulativeness or prejudice, the probative value of evidence must be substantially outweighed by its potential for undue prejudice or cumulative effect. Fed.R.Evid. 403. This determination will not be overturned on appeal absent an abuse of discretion. Russell, 971 F.2d at 1104. Here, the evidence was prejudicial, in that it bolstered the government's case against Piloto, but was not unduly so--any piece of relevant evidence introduced by the prosecution will be prejudicial to the defendant, but only evidence which creates undue prejudice, such as evidence which inflames irrational passions of the jury, should be excluded. The evidence was also not more cumulative than probative--only two witnesses testified to the existence and authenticity of the receipt--the coconspirator author, Thomas, and the state trooper--a completely reasonable number. Thus, the district court committed no error in admitting the receipt.
 
 
 52
 G. Defendant's Request for Multiple Conspiracy Jury Instruction.
 
 
 53
 Piloto challenges the district court's denial of his request for a multiple conspiracy jury instruction. The district court rejected such an instruction as unsupported by the evidence, and instead gave a single conspiracy instruction.
 
 
 54
 "[I]t is improper to charge a single conspiracy when multiple conspiracies exist," United States v. Urbanik, 801 F.2d 692, 695 (4th Cir.1986) (citing Kotteakos v. United States, 328 U.S. 750 (1946)). However, "[i]f the facts support only a single conspiracy, the jury need not be instructed about multiple conspiracies." United States v. Crockett, 813 F.2d 1310, 1316 (4th Cir.) (citations omitted), cert. denied, 484 U.S. 834 (1987). "A single conspiracy exists where there is 'one overall agreement,' or 'one general business venture.' " United States v. Leavis, 853 F.2d 215, 218 (4th Cir.1988) (quoting United States v. Bloch, 696 F.2d 1213, 1215 (9th Cir.1982), and United States v. McGrath, 613 F.2d 361, 367 (2d Cir.1979), cert. denied, 446 U.S. 967 (1980)).
 
 
 55
 The evidence here supported a single rather than a multiple conspiracy jury instruction. The main supplier for the conspiracy throughout was Piloto, and Thomas and Artie Smith were the main distributors. The method of driving cocaine from Miami to North Carolina was similar throughout as well. Thus, the jury instructions as given were not erroneous.
 
 
 56
 H. Sufficiency of the Evidence of Agreement .
 
 
 57
 The elements of the crime of conspiracy are: (1) an agreement between the defendant and one or more other persons (2) to violate the law. United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991) (citing Morrison v. California, 291 U.S. 82, 92 (1934)). The elements of the specific conspiracy charged here are: (1) an agreement between Piloto and one or more others (2) to possess with the intent to distribute and to distribute cocaine. Piloto challenges the sufficiency of the evidence at trial as to the existence of an agreement between himself and others.
 
 
 58
 A jury verdict must be upheld if, viewing the evidence by taking all reasonable inferences in the light most favorable to the government, substantial evidence supports the verdict. Glasser v. United States, 315 U.S. 60, 80 (1942). The requisite proof of conspiracy is often shown by circumstantial evidence, Giunta, 925 F.2d at 764, and can be inferred from the totality of the circumstances, United States v. Mabry, 953 F.2d 127, 130 (4th Cir.1991), cert. denied, 504 U.S. 914 (1992). A conspiracy can be linked merely by a "mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." United States v. Banks, 10 F.3d 1044, 1054 (4th Cir.1993), cert. denied, 114 S.Ct. 1850 (1994), and cert. denied, 114 S.Ct. 2681 (1994). A showing that the defendant knew of the conspiracy's purpose and took some action indicating participation is sufficient to sustain a conspiracy conviction. United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir.1984), cert. denied, 469 U.S. 1105 (1985).
 
 
 59
 Viewing the evidence at trial by taking all reasonable inferences in the government's favor, there was more than sufficient evidence to establish all of the elements of conspiracy. Although no witness testified to an explicit verbal agreement between Piloto, Thomas, Artie Smith, Fox, Holmes, and Mabe, circumstantial evidence sufficiently established that all were joined by an agreement collectively to possess with intent to distribute and to distribute cocaine in North Carolina. Piloto's knowledge of a purpose to distribute was established by the evidence that he sold large quantities of cocaine, because cocaine is not used in large quantities for individual personal consumption. See United States v. Prieskorn, 658 F.2d 631, 634-35 (8th Cir.1981) (holding large quantity of cocaine supports reasonable inference that defendant knew he was part of a venture which extended beyond his individual participation). Piloto took action to aid this purpose, according to the testimony at trial, by supplying cocaine to Smith and Thomas, who transported and sold the cocaine with the aid of Fox, Holmes, and Mabe. Although the defense presented some evidence that Carballo was the source of the cocaine, the jury weighed the evidence and found, beyond a reasonable doubt, that Piloto was guilty of the conspiracy charged. We will not disturb the jury's well-supported verdict.
 
 
 60
 I. Enhancement for Manager or Supervisor Role.
 
 
 61
 Piloto objected at sentencing to the three-level sentence enhancement which the district court gave him for his role in the conspiracy. Piloto raises this issue again on appeal.
 
 
 62
 The district court enhanced Piloto's sentence pursuant to Section 3B1.1 of the United States Sentencing Guidelines based on the factual finding that Piloto was "a manager or supervisor (but not an organizer or leader)." See U.S.S.G. Sec. 3B1.1(b). Factual findings at sentencing are reviewed for clear error on appeal. United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989) (citing Anderson v. City of Bessemer City, 470 U.S. 564, 573-76 (1985)). The commentary to the above sentencing guideline states:
 
 
 63
 Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 64
 U.S.S.G. Sec. 3B1.1(a), Application Note 4 (Nov. 1, 1992). Relative responsibility for the crime is also a factor to consider. See U.S.S.G. Sec. 3B1.1, Background.
 
 
 65
 In the instant case, evidence showed that Piloto kept quite a substantial share of the profits, as there was some evidence that he had used cocaine profits to build his home. The determinative factor, however, was simply the nature of his participation in the commission of the offense--Piloto was a supplier of substantial quantities of cocaine, intended for further distribution. Thus the district court's application of a three-level sentence enhancement for Piloto's role in the offense was not clearly erroneous.
 
 
 66
 J. Defendant's Motion for a New Trial.
 
 
 67
 After trial, the government informed defense counsel that prior to trial, Artie Smith revealed to a government agent that he (Smith) had paid an employee of the telephone company to destroy all records of his long distance calls. The agent had not brought this to the attention of the government's attorney in the case because the agent had subsequently subpoenaed all of Smith's phone records and the records appeared to be in order. Defense counsel moved for a new trial based on newly discovered evidence, on the grounds that this evidence might introduce reasonable doubt in the minds of the jurors that other phone calls were made which would have shown Carballo to have been the cocaine supplier, not Piloto. The district court denied the motion, finding that the new evidence would be "merely impeaching" and did not constitute "material evidence which might have affected the outcome of the trial."
 
 
 68
 Rule 33 of the Federal Rules of Criminal Procedure provides that a district court may grant a new trial upon motion of a defendant "if required in the interest of justice." Fed.R.Crim.P. 33. In United States v. Bales, 813 F.2d 1289 (4th Cir.1987), we set forth the following test for determining whether a new trial should be granted based on newly discovered evidence:
 
 
 69
 (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such a nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.
 
 
 70
 Id. at 1295 (citations omitted). We review the district court's denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. United States v. Chavis, 880 F.2d 788 (4th Cir.1989).
 
 
 71
 In the instant case, the district court concluded, and we agree, that parts (c) and (e) of the Bales test were not met. As there was no evidence produced by the defense that phone numbers actually were removed from Smith's phone bill, the primary value of the evidence of Smith's attempt to have the phone numbers deleted from his records would be impeaching, and thus part (c) of the Bales test was not met. Even if the defense were to have raised some doubt that Smith might have effectively removed some phone numbers from his bill, this evidence would not "probably produce an acquittal," and thus part (e) of the Bales test was not met. Multiple witnesses testified that Piloto, whom each witness positively identified in the courtroom, had been the source of kilograms of cocaine. The testimony of the witnesses was consistent in all significant respects. Even if another supplier of drugs existed, whose phone number had effectively been removed from Artie Smith's phone records, the existence of another drug supplier would probably not have produced an acquittal of defendant Piloto. Therefore, the district court acted properly in denying the motion for a new trial.
 
 III. CONCLUSION
 
 72
 Based upon the foregoing, Piloto's conviction and sentence are,
 
 
 73
 AFFIRMED.
 
 
 
 [1]
 Specifically, the defense tried to show that the phone calls placed while Piloto was supposedly in El Salvador proved that Enriko Carballo was the source of drugs, not Piloto
 
 
 [2]
 Piloto also claims that the district court erred in failing to give the jury a limiting instruction, telling the jury that the defendant could not be convicted for acts prior to the period of the indictment. However, a review of the record reveals that the district court did give such an instruction, twice