John Witten TUNNELL, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

No. CIV.A. 4:03CV00074.

United States District Court,
W.D. Virginia,
Danville Division.

Aug. 4, 2004.

Fred Dempsey Smith, Jr., James Warren Haskins, Young Haskins Mann & Gregory PC, Martinsville, VA, for plaintiff.

Barry C. Toone, Paul G. Cereghini, Bowman & Brooke LLP, Phoenix, AZ, Brian K. Telfair, Julie A. Childress, Bowman and Brooke LLP, Richmond, VA, John R. Reid, Jr., Cabaniss Smith Toole & Wiggins PL, Maitland, FL, for defendant.

## ORDER

MOON, District Judge.

Pursuant to the authority in 28 U.S.C. § 636(b)(1), this matter was referred to The Honorable Michael F. Urbanski, United States Magistrate Judge, for proposed findings of fact, conclusions and recommendations for the disposition of certain motions filed by plaintiff John Witten Tunnell ("Plaintiff") to exclude the testimony of defendant Ford Motor Company's ("Defendant") expert witnesses Andrew Neuhalfen, Eric Dahlquist, Sr., Ralph Newell, James C. Valentour, Ph.D., H. Gray Broughton, C.R.C., C.C.M. and Victor DeClercq, in addition to a motion to exclude the opinions and testing of Defendant's accident reconstruction expert, John Habberstad.

The Report and Recommendations was entered on July 2, 2004 (the "July 2, 2004 Report"). Plaintiff filed objections on July 15, 2004. Defendant filed objections on July 19, 2004. Defendant filed responses on July 26, 2004. A hearing was held in connection with this matter on July 28, 2004.

The Court finds no portion of the July 2, 2004 Report to be clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a). The Court therefore ADOPTS the July 2, 2004 Report in its entirety.

It is so Ordered.

The Clerk of the Court hereby is directed to send a certified copy of this Order to all Counsel of Record and to Magistrate Judge Urbanski.

## REPORT AND RECOMMENDATION ON PLAINTIFF'S DAUBERT MOTIONS

URBANSKI, United States Magistrate Judge.

This matter is before the court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) concerning plaintiff John Witten Tunnell's motions to exclude the testimony of defendant Ford Motor Company's expert witnesses Andrew Neuhalfen, Ralph Newell, Victor DeClercq, Eric Dahlquist, James Valentour, John Habberstad and H. Gray Broughton. These issues have been exhaustively briefed and argument was conducted on June 23, 2004.

### OVERVIEW

■ It is recommended that the motion to exclude fire origin expert Andrew Neuhalfen be overruled as his testimony is sufficiently grounded in National Fire Prevention Association (NFPA) 921 methodology and the facts of this case to be admissible under Fed.R.Evid. 702 and the standard established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Tunnell's motion to exclude fire origin expert Ralph Newell is sustained in part and overruled in part. Newell may not render an opinion that the cause of the fire was flammable alcohol as there is no evidence of any flammable alcohol in the 1999 Mustang GT, and his speculation as to the presence of high alcohol content liquor is as unduly prejudicial as it is baseless.

Tunnell's motion to exclude the opinions of Victor DeClercq is overruled. Based on his education, training and years of work as an electrical engineer for Ford and inspection of the 1999 Mustang GT, DeClercq may testify as to the lack of evidence of electrical arcing and provide an opinion as to the significance of same. DeClercq may also testify as to Ford and industry experience with battery disconnect devices.

Tunnell's motion to exclude the opinion testimony of Eric Dahlquist as to consumer expectations is sustained as Dahlquist wholly lacks qualifications, application of

any methodology or an appropriate level of knowledge concerning the issue. In short, reading car magazines does not qualify Dahlquist as an expert under Fed.R.Evid. 702.

Tunnell's *Daubert* motion as regards toxicologist James Valentour's testimony is overruled as Valentour is qualified, and he employed a recognized methodology adequately based on the facts of this case. It is recommended, however, that Valentour's opinion as to blood alcohol level of Tunnell be excluded from Ford's case in chief as the blood alcohol level of a passenger in a vehicle is not relevant to the issue of foreseeable misuse. To the extent that Ford seeks to introduce Valentour's opinion under Fed.R.Evid. 607 to impeach Tunnell's recollection of the events of the night of the accident, its introduction must be weighed carefully against the prejudicial impact of this evidence under Rule 403. As such, a determination necessarily involves consideration of the specific testimony involved, the balance of the probative value of this testimony and its prejudicial impact must be made at trial.

Assessment of the expert opinion of John Habberstad as to the speed of the 1999 Mustang GT at impact is dependent upon comparison of certain crash test data which is being generated at this time. Absent substantial similarity in the data collected from the restraint control modules of the crash test and the Athey/Tunnell vehicle, there appears to be no empirical way to determine whether Habberstad's crash tests were substantially similar to the accident apart from a rather crude photographic analysis. As a result, Tunnell's *Daubert* motion as regards Habberstad's crash test opinion is taken under advisement until the data from the restraint control module of the 1999 Mustang GT and test vehicles may be compared.

Tunnell's complaints about the testimony of defendant's vocational rehabilitation expert, Eric Broughton, properly go to the weight, and not the admissibility, of his testimony.

## STATEMENT OF FACTS

On November 18, 1999, Plaintiff Tunnell was in the front passenger seat of a 1999 Ford Mustang GT driven by Blake Athey which collided with a utility pole in Henry County, Virginia. Tunnell suffered a broken leg and was pinned in the vehicle by the resulting damage from the collision. Some five minutes after the collision, but before Tunnell could be freed from the wreckage, a fire ignited in the passenger compartment. Some eyewitnesses at the scene believed the fire to be electrical in origin because of the odor of the fire, and because they saw blue "sparking" in the dashboard. One eyewitness, Sally Jinright, testified that she "noticed a flickering like in the center of the dash in the console area and I started smelling what smelled like electrical wires burning and everything." Jinright Dep. at 7. When asked how tall the flame was, Jinright testified that "[i]t was just a flicker like behind the console, behind the dash. I couldn't tell.... It was kind of like a bluish flickering." *Id.* at 8. Another eyewitness, Cynthia Weaver, testified that she saw a "spark" "right in through one of those vents" located to the right of the passenger seat. Weaver Dep. at 29–30. Weaver described the "spark" as being "like a light, a butane lighter. Like when you first strike a butane lighter, it's blue and then the blue spark just kind of ran up a little bit and then it kind of beared off and then it started turning bright yellow like orange." Weaver Dep. at 30–31. Tunnell, pinned inside the car for roughly forty-five minutes, was severely burned as fire engulfed the car's interior.

Tunnell brings this product liability action against Ford for breach of implied

warranty and defective design as a result of his burn injuries. Tunnell claims that the 1999 Mustang GT was defective in design and unreasonably dangerous because it did not have a safety device to disconnect the battery after the collision, which he contends would have prevented the fire from starting. By means of expert testimony, Tunnell will seek to prove that the fire started in the dashboard because the wiring harness was crushed on impact. As there was no battery disconnect device or other means to shield the wires from crush damage, the still energized wires were crushed in the impact, causing an electrical event known as a high resistance fault. Tunnell's experts claim, based on their examination of the vehicle employing national fire origin investigation methodology, that the fire was caused by a high resistance fault. A characteristic of such a fault is that it could have started a fire without blowing a fuse.

Although there are no government or industry standards requiring automobile manufacturers to equip vehicles with battery disconnect devices, the auto industry has been aware of the hazard associated with post-collision fires for years. Tunnell expects to introduce evidence that Ford's internal studies of this issue dating back to 1975 state that installation of such devices would have eliminated post-collision fires by eight-five (85%) percent. In 1978, Ford estimated the cost of available battery-disconnect switches to be $2.50 (in 1973 dollars). Further, the National Highway Traffic and Safety Administration ("NHTSA") asked the industry to comment on the efficacy of such devices in 1975 and 1995. Thus, the hazard was well known. In fact, Ford uses an inertia disconnect switch to shut off power to the fuel pump in the case of impact. Therefore, Tunnell contends that such an inertia disconnect device should have been attached to the battery as well. Nevertheless, it is undisputed that no Ford or other vehicle sold in 1999, or since, had such an inertia battery disconnect device.

Tunnell's expert engineer, Jerry Wallingford, has installed such a device on a 1999 Mustang GT, and opines that this device, coupled with other commonly available materials, would have prevented Tunnell's burn injuries. At least one of Ford's deposed witnesses, Victor DeClercq, appears to agree. DeClercq testified that Ford considered a battery disconnect device as a means to prevent vehicle fires, and admitted, albeit tentatively, that "at least it's a possibility, that an electrical cutoff may have assisted or may have helped in this case. And that's not even completely certain in my mind yet." DeClercq Dep. (7/29/02) at 47.

Tunnell seeks to establish a breach of implied warranty by proving that Ford failed to meet reasonable consumer expectations regarding such a battery disconnect device. As evidence of reasonable consumer expectations, Tunnell offers circumstantial evidence regarding the industry's awareness of the hazard and the feasibility of a safety measure, as well as direct evidence in the form of retrospective consumer expectations surveys.

Ford contends that Athey and Tunnell's misuse of the 1999 Mustang GT was unforeseeable and that the fire did not start because of a high resistance fault in the wiring harness behind the dash. Focusing heavily on the fact that several witnesses, including Tunnell himself, described the flame as initially blue, Ford suggests that the fire started in the passenger compartment and was ignited either by the butane lighter Tunnell had in his pocket, smoking materials and/or alcohol. Ford calls Andrew Neuhalfen, an electrical and professional engineer, who opines that the cause of the fire cannot be electrical because there was no evidence of electrical arcing in the subject Mustang. Having so ruled

out an electrical origin, Neuhalfen focuses his theory of ignition on the lighter and smoking materials. Ford offers another fire origin expert, Ralph Newell, who also opines that the cause of the fire was not electrical and posits that it may have been fueled by burning alcohol. Ford also has identified one of its in-house engineers, Victor DeClercq, who is expected to opine that the cause of the fire was not electrical on the basis of the lack of any evidence of electrical arcing. DeClercq also will testify from his many years of experience with Ford that a battery disconnect device was neither practical nor feasible. Ford also identifies Eric Dahlquist on the issue of consumer expectations, but he is neither qualified nor applies any methodology in reaching his opinion other than reading car magazines. Ford identifies James Valentour, a toxicologist, to testify as to the level of alcohol in Tunnell's blood at the time of the accident and James Habberstad to testify concerning the speed of the Athey vehicle at impact. Finally, Ford expects to call H. Gray Broughton on the issues of lost wages and lost earning capacity.

Tunnell has filed motions to exclude the testimony of each of these witnesses which will be addressed in turn.

### APPLICABLE LAW

*1. Federal Rules of Evidence 702 and 703, and Daubert Standard*

■ The court is obligated to serve as gatekeeper where expert opinion evidence is proffered to determine whether expert opinion is grounded in objective underlying scientific methodology as opposed to mere speculation or conjecture. *Daubert,* 509 U.S. at 589–590, 595, 113 S.Ct. 2786 ("focus, of course, must be solely on principles and methodology, not on the conclusions they generate"). *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141–142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The

court's obligation is codified in the Federal Rules of Evidence 702 and 703. The applicable rule governing admissibility of testimony by experts is Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. *See also* Advisory Committee Notes to Rule 702, 2000 Amendments ("A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.") The applicable rule governing the legitimacy of underlying bases of opinion testimony by experts is Federal Rule of Evidence 703, which provides in part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed.R.Evid. 703. In other words, expert testimony that can assist the trier of fact is to be admitted at trial where a preliminary assessment finds "the reasoning or methodology underlying the [proffered] testimony is scientifically valid and ... that reasoning or methodology properly can be applied to the fact at issue." *Daubert,* 509

U.S. at 592–593, 113 S.Ct. 2786 (internal footnote omitted). *See also* Fed.R.Evid. 703 at Advisory Committee Notes, 1972 Proposed Rules ("The rule ... offers a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence. Attention is directed to the validity of the techniques employed rather than to relatively fruitless inquiries whether hearsay is involved.").

■ In determining the reliability of the methodology or technique underlying the formation of an expert's opinion (as opposed to the results, conclusion, or opinion of a scientific endeavor of an expert), the court *may* consider several factors in a flexible manner depending on the particular circumstances of each case, as there are numerous types of expertise. *Kumho Tire*, 526 U.S. at 150–151, 119 S.Ct. 1167. "These factors include: [1] Whether a 'theory or technique ... can be (and has been) tested'; [2] Whether it 'has been subjected to peer review and publication'; [3] Whether, in respect to a particular technique, there is a high 'known or potential rate of error' and [4] Whether there are 'standards controlling the technique's operation'; and [5] Whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Id.* at 150, 119 S.Ct. 1167, citing *Daubert*, 509 U.S. at 592–594, 113 S.Ct. 2786. However, these factors remain uncodified and by no means constitute a "definitive checklist or test." *Id., citing Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. As such, the court remains mindful that, in carrying out its gatekeeper function through preliminary assessment of the reliability of an underlying methodology serving as the basis of an expert's opinion, it must also root out overly pessimistic or automatic challenges that would otherwise cloud the capabilities of the jury and advocacy system. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. Therefore, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.; cf. Kumho Tire*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (affirming expert testimony as inadmissible where expert employed purely subjective conjecture as basis for opinion and where no evidence existed that any other tire expert accepted proffered subjective methodology); and *Oglesby v. General Motors Corp.*, 190 F.3d 244 (4th Cir.1999) (holding expert's opinion inadmissible where based on pure speculation as opposed to accepted methodologies of testing or researching broken pipe).

### I. Fire origin experts, Andrew Neuhalfen and Ralph Newell.

#### A. Andrew Neuhalfen's opinion is admissible as to the cause of the post-collision fire as sufficiently based on NFPA 921 and grounded in the facts of this case.

■ Tunnell argues that Ford's electrical engineering expert, Andrew Neuhalfen, may not offer an expert witness opinion regarding the cause and origin of the fire in this case for essentially two reasons: (1) At deposition, Neuhalfen abandoned the opinion Ford's brief states he will offer at trial; and (2) Neuhalfen's crash dynamics theory, in which he posits that any post-collision automobile fire of electrical origin caused by crush damaged wires will be evident from the presence of electrical arcing, lacks scientific basis.

There is no assertion by Tunnell that Neuhalfen is not qualified to render fire origin opinions or that his opinions are not based on an established scientific methodology. Neuhalfen has a Ph.D. in Materials Science and Engineering and a bachelors degree in Electrical Engineering. Neuhalfen is a licensed professional engineer in the State of Illinois and has testified in numerous state and federal courts, including on issues related to fire investigations

in motor vehicles. As with Tunnell's experts, Neuhalfen grounds his opinion on the prevailing industry standard, NFPA 921.

Ford counters that Neuhalfen has not abandoned his opinion that the origin of the fire in this case was other than electrical and must have come from an ignition source, e.g., a butane lighter or smoking materials, from the passengers. Ford indicates that Neuhalfen's opinion has been consistent, both internally and with eyewitness accounts of the accident. Central to Ford's experts' theories and its defense of this case is its assertion that all three eyewitness to the accident, Sally Jinright, Carol Weaver and Tunnell himself described a blue flame at the outset of the fire. Jinright and Weaver mention a blue flame as being in the dash. While Jinright places the fire near the center console, Weaver places it as being inside the right hand passenger seat air conditioner vent. Tunnell testified that the first indication of the fire was "kind of a bluish flame" ... "coming out from right under the dash near the center part of the dash." Tunnell Dep. at 182–83. Ford contends that a blue flame arises from only three sources—butane, natural gas or alcohol—and that Tunnell had a butane lighter in his baggy pants pocket before the accident. As no lighter was found after the accident, Ford theorizes that the lighter could have been thrown from his pocket in the impact and could have ignited in some fashion. As support for this "flying lighter" theory, Ford notes that Tunnell's keys also were thrown from his pocket during the collision and were found on the floor of the passenger seat after the accident.

While a jury ultimately may find Neuhalfen's "flying lighter" theory too far-fetched to be credited, this theory is not without support in the record to be rendered inadmissible on a *Daubert* challenge. Several facts support this theory: (1) Jinright, Weaver and Tunnell all described the fire as being a small blue flame, at least initially; and (2) Tunnell's keys, in his pocket before the collision, were found on the floorboard of the car after the wreck, and his butane lighter was never recovered.

Neuhalfen alternatively suggests that the fire could have originated in the passenger compartment and was ignited by either Athey's or Tunnell's smoking materials. Athey cannot recall the accident or anything he was doing at the time of the collision, and Tunnell contends that neither he nor Athey were smoking at the time of the accident. Tunnell Dep. at 150–151. No witness described seeing any ignited smoking materials. Ford contends nevertheless that Neuhalfen's alternative smoking materials theory is admissible because it is both methodologically grounded in the deductive reasoning process of NFPA 921 and is factually supported. Athey and Tunnell had smoking materials with them, and Tunnell's window was cracked open two inches despite the twenty-six degree winter night, suggesting that Tunnell was indeed smoking. Neuhalfen Dep. at 36, 46–47. Neuhalfen theorizes that the smoking materials may have ignited the cardboard beer container on the floor in front of Tunnell's seat or other unidentified flammable materials located there. *Id.*[1] As with the Neuhalfen's "flying light-

---

**1.** There is no evidence, however, that there was any flammable alcohol in the vehicle. No one can credibly suggest that Coors Light beer, found in the car after the accident, is flammable. There is evidence that the cardboard Coors Light box was burned in the blaze, along with everything else in the pas-

senger compartment. The expert witness demonstration conducted by defendant's other fire origin expert, Ralph Newell, in which he uses whiskey to set fire to a Ford Explorer seat is wildly speculative and unduly prejudicial and may not be admitted.

er" theory, the smoking materials theory is not so abjectly baseless to require that his opinion be stricken at this stage. The question of the cause of the post-collision fire in the 1999 Mustang GT is for the jury, and both Neuhalfen's "flying lighter" and smoking materials theories are for the trier of fact to consider.

Likewise, the fact that Neuhalfen, at deposition, testified that the "flying lighter" theory was less likely to have occurred than another theory, Neuhalfen Dep. at 31–32, is properly the subject of cross-examination and impeachment of Neuhalfen at trial, and does not render his opinion so fundamentally flawed in either a scientific, methodological or factual sense to require its exclusion. To the extent that Neuhalfen's opinions ought not be credited because he may have changed them over time, that is properly the subject of cross-examination and argument to be decided by the trier of fact.

Finally, Tunnell argues that Neuhalfen's crash dynamics theory, in which he opines that because of the forces involved, evidence of electrical arcing must be present in any post-collision fire caused by crash damaged wires, is insufficiently grounded in scientific methodology to be admissible. As regards the issue of electrical arcing, several points are undisputed. Both sides agree that if an electrical fire is caused by electrical arcing, post-fire evidence of such arcing would exist. Second, both sides agree that there is no evidence of any electrical arcing in this case.

As there is no evidence of electrical arcing in this case, Neuhalfen concludes that the source of the fire cannot be electrical. Neuhalfen rejects Tunnell's high resistance fault theory because Chapter 22 of NFPA 921 states that a high resistance fault is caused by overloaded, as opposed to crash damaged, wiring which causes electrical arcing. Based on Chapter 22 of NFPA 921, Neuhalfen concludes that the

only way crushed or damaged wires may cause a fire is through electrical arcing. It is this opinion—Neuhalfen's rejection of the notion that damaged wires may cause a high resistance fault leading to fire—that Tunnell claims is scientifically unsound. In particular, Tunnell contends that there is nothing in either Chapter 6 or Chapter 22 of NFPA 921 (upon which Neuhalfen purports to rely), which supports his crash dynamics theory.

Chapter 6 of NFPA 921 is titled "Electricity and Fire," and contains a general discussion of the relationship of the two. Chapter 22 is titled "Motor Vehicle Fires," and contains a more specific discussion of the same. Both chapters discuss the fact that electrical fires can be started by high resistance faults or electrical arcing, and parts of each chapter alternatively support the opinions of both Ford's and Tunnell's experts.

For example, in Chapter 22 and Chapter 6, the fact that high resistance faults may cause fires in wiring harnesses without activating circuit protection (blowing fuses) is discussed. *See* NFPA 921 §§ 22.4.2.1; 6.9.6. NFPA 921 § 6.9.6 also mentions that "[i]t is rare to find evidence of a high-resistance fault after a fire." These references support Tunnell's theory of the case.

On the other hand, in Chapter 22, high resistance faults are mentioned under the heading "Overloaded Wiring," NFPA 921 § 22.4.2.1, whereas that chapter describes that "[e]lectrical arcing can result when the conductor's insulation becomes worn, brittle, cracked or damaged, allowing it to contact a grounded surface.... In postcrash situations, arcs can be generated through the crushing or cutting of wires, particularly battery and starter cables, which are not electrically protected and are designed to carry high currents. The large amount of energy available in a battery can be enough to ignite materials such

as engine oil accumulations, some plastic materials, and electric insulation." To the extent that Chapter 22 mentions crash damaged wires only in connection with electrical arcing, this reference supports Ford's theory of the case.

As a result, plaintiff's objection that Neuhalfen's crash dynamic theory is not supported by Chapter 22 is simply wrong as the only reference to post-collision fires is in the section relating to electrical arcing. Neuhalfen's opinion, grounded in the same fire origin methodology as Tunnell's experts, simply reaches a different conclusion. Neither Rule 702 nor *Daubert* provides any support for the exclusion of Neuhalfen's opinion, and it is for the jury to decide, based on the facts of the case, whether Ford ought to be responsible for the origin of the fire.

Neuhalfen's opinion is nothing like the opinion of the expert in *Chester Valley Coach Works v. Fisher–Price, Inc.,* 2001 WL 1160012, 2001 U.S. Dist. LEXIS 15902 (August 29, 2001 E.D. Pa.), where the expert put the cart before the horse and determined the cause of the fire before he determined its origin, precisely the opposite of what the NFPA 921 methodology requires. In addition, the expert in that case never inspected the fire scene because plaintiffs would not pay him to do so. Nor did the expert review witness accounts of the fire or use a systematic approach utilizing the scientific method. In short, the expert witness in *Chester Valley* made no pretense of following an established methodology, and his analysis bears no relation to Neuhalfen's. Likewise, Tunnell's citation of *Claar v. Burlington Northern,* 29 F.3d 499 (9th Cir. 1994), is equally misplaced. There the experts reached the conclusion that exposure to certain chemicals caused personal injuries, but the experts applied no methodology, failed to consider or rule out other possible causes, and failed to explain how they arrived at their conclusions. Although Tunnell and his experts disagree with the conclusion reached by Neuhalfen, his opinion is sufficiently grounded in the NFPA 921 methodology and the facts of this case to be admitted.

**B. Ralph Newell is a qualified fire origin expert whose opinion testimony as to burn pattern analysis and witness statements that the fire started in the passenger compartment and as to the potential sources of the blue/yellow flame is admissible; but his patently absurd and factually baseless opinion and videotape test that the fuel for the fire was high proof alcohol, such as Wild Turkey or Jack Daniels, is inadmissible as there is no evidence that such substance was present in the vehicle.**

As noted above, Ford hinges its defense of this case on the fact that three eyewitnesses noted that the flame was initially blue. Ford contends that a purely blue flame has limited sources, including natural gas, butane and alcohol. As there was no suggestion that Athey and Tunnell had any natural gas in the car, Ford focuses its scientific defense on the butane and the alcohol. As noted above, Neuhalfen posits that one possible source of the fire was the butane lighter in Tunnell's pocket, the other being smoking materials.

Given the testimony that the flame was initially blue, Newell tries to suggest that alcohol was the source of the fire and conducts a test in which he sets Wild Turkey and Jack Daniels whiskey on fire, both in a pan and on a Ford Explorer seat. The problem with Newell's analysis is that there is absolutely no evidence that such highly flammable liquor was present in the 1999 Mustang GT. While there was Coors

Light beer in the car, the alcohol content of such beer is a mere fraction of that found in distilled liquors, therefore it would serve no legitimate purpose to allow Newell to testify about burning liquor as the source for this fire. As such, his opinion that alcohol was the source of the fire and his Jack Daniels/Wild Turkey fire tests are inadmissible as completely devoid of any factual basis and unduly prejudicial under Fed.R.Evid. 403.

Nevertheless, Tunnell raises no objection as to Newell's qualifications, and he may testify as to the origin of the fire based on his analysis of the burn patterns in the passenger compartment of the Mustang GT and witness statements as to the source and initial color of the flame. Such an analysis is consistent with Chapter 15 of NFPA 921. *See* NFPA 921, § 15.1 ("Determination of the origin of the fire frequently involves the coordination of information derived from the following: (1) The physical marks (fire patterns) left by the fire. (2) The observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire. . . ."). Newell may also testify about his fire vector analysis as that methodology is recognized in NFPA 921 § 15.2.3. What Newell may not do, however, is engage in prejudicial speculation as to the ignition source of the fire which lacks any basis in fact.

Tunnell complains that Newell made no pictures or notes reflecting his fire vector analysis, and questions whether he actually did the analysis. The extent to which Newell's scientific method is subject to criticism by failing to record his observations may be brought out during cross-examination and is properly a question of the weight to be given this evidence by the jury.

As noted above, ultimately the question of the origin of the fire in this case is for the jury to decide based on all of the theories that have any basis in fact. As with Tunnell's experts, Neuhalfen and Newell are qualified and their opinions are methodologically grounded in NFPA 921 and supported by some facts. At this stage, the only fire origin opinion that appears to be both unduly prejudicial and totally unfounded on any basis in fact is the opinion that this fire was ignited by alcohol. Ford concedes that the only alcohol found in the vehicle was beer, and that beer is not flammable. There is no more evidence in this case that there was flammable alcoholic beverages present in this car than there was napalm. Hence, Ford should not be allowed to argue that it was flammable alcohol that ignited this fire absent any such evidence. It is recommended, therefore, that Newell's opinion and test involving burning whiskey be excluded.

**II. Ford engineer Victor DeClercq's expert opinion testimony is admissible regarding the absence of any evidence of electrical arcing and the practicality and feasibility of battery disconnect devices.**

▮ Tunnell correctly argues that Victor DeClercq, a longtime Ford engineer, has no qualifications to present a fire origin opinion, and he may not do so. Both on brief and at argument, Ford concedes that DeClercq will offer no fire origin opinion. Rather, Ford states that DeClercq's testimony was being offered only for the purpose of testifying to the absence of any electrical arcing in this case and to counter the theory that the fire may have been caused by a high resistance fault. DeClercq is a long-time Ford engineer with decades of experience in performing electrical system testing and products liability investigations for Ford. As such, DeClercq appears qualified to assist the jury as regards the issue of physical manifestations of electrical arcing.

Tunnell also objects to allowing De-Clercq to testify as to whether anyone in the industry had battery disconnect devices in 1999. DeClercq was responsible for electrical systems testing at Ford from 1984–1994 and provided vehicle design reviews for Ford from 1994—1999. Ford states that DeClercq will testify that no vehicle he tested had a battery disconnect device in 1999 and that no production vehicles had such a device. DeClercq will also testify that "within Ford Motor Company, there had not been a battery cut-off switch prototype that reached the design or pre-production stage of vehicle level testing." Ford's Brief in Opp. Mot. Exclude DeClercq at 6. In this regard, DeClercq's testimony appears to be factual rather than opinion.

While Tunnell argues that DeClercq did not review the available literature and that his testimony is not adequately supported by the literature, DeClercq's years of working in this field for Ford clearly allows him to testify to industry and Ford practices as regards battery disconnects. To the extent that DeClercq's testimony may be subject to attack based on his limited review of the appropriate literature, that is a factor which may be taken into consideration by the jury in assessing the weight to be given to DeClercq's testimony.

**III. Eric Dahlquist is not qualified to testify as to consumer expectations regarding safety devices in the 1999 Mustang, therefore his opinion testimony is inadmissible.**

■ Tunnell argues that Eric Dahlquist is not qualified to render any opinion in this case, has based his opinion on no facts or data, and has employed no reliable methodology. Thus, Dahlquist's opinion is inherently unreliable and ought not be admitted. Prior to 1975, Dahlquist worked as an editor of several automobile magazines but has since worked in public rela-

tions, marketing and product placement for The Vista Group in Burbank, California. Based on his work experience more than a quarter century ago as an editor of Hot Rod and Motor Trend magazines, Dahlquist may have once had some detailed knowledge as regards certain aspects of the auto industry. But Dahlquist has been out of that business for the past 30 years, and has instead been involved getting various cars placed in Hollywood productions such as "Smokey and the Bandit." Although Ford argues that Dahlquist continues to read industry publications such as Auto Week, Road & Track and Popular Mechanics, he has performed no study or published any literature on the issue of consumer expectations of anything, much less battery disconnects or other automobile safety devices. Dahlquist has no knowledge of the issues of this case and his only apparent qualification is public relations work undertaken for auto industry and other clients and reading industry magazines. As such, Dahlquist possesses no qualifications recognized by Fed.R.Evid. 702 to render any expert opinion which may assist the trier of fact in this case. It is recommended that his opinion as to consumer expectations not be allowed.

**IV. Tunnell's *Daubert* motion as regards James Valentour's testimony is overruled as Valentour is qualified and employed a recognized methodology adequately grounded in the facts of this case. Nonetheless, Valentour's opinion as to Tunnell's intoxication is not relevant to any disputed issue and may not be introduced except to impeach Tunnell's recollection of the events of the crash.**

■ Tunnell challenges Ford's toxicology expert, James Valentour, on two grounds. Tunnell makes no challenge to

Valentour's qualifications or methodology, but asserts that his opinion is not scientifically grounded because the hospital drug screen on which he bases his calculation as to Tunnell's blood alcohol at the time of the accident contains a disclaimer that it is "intended only for medical management of patients. It was collected and processed without maintenance of a chain of custody and, therefore, should not be used for medico-legal purposes." Tunnell's challenge on this ground is flawed, as Fed. R.Evid. 703 allows an expert to base his opinion on facts which may not be admissible but which are sufficiently reliable upon which to base an expert opinion. Second, Tunnell argues that Valentour's opinion is not relevant to any issue in this case.

Tunnell's evidentiary challenge to the basis of the Valentour opinion is not sufficient to exclude his testimony. Tunnell argues that Fed.R.Evid. 803(6) provides for exclusion of this hearsay because the disclaimer evidences a lack of trustworthiness. Simply because the medical record Valentour relies on from Roanoke Memorial Hospital contains a disclaimer, however, does not mean that the underlying data is unreliable. In *Thomas v. Hogan*, 308 F.2d 355 (4th Cir.1962), the Fourth Circuit held that hospital records indicating blood alcohol content are sufficiently trustworthy as they are created and maintained for the purpose of treatment. As the Fourth Circuit noted:

> There is good reason to treat a hospital record entry as trustworthy. Human life will often depend upon the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks. To this extent at least, hospital records are deserving of a presumption of accuracy even more than other types of business entries.

308 F.2d at 361. *See United States v. Farmer*, 820 F.Supp. 259, 265 (W.D.Va.

1993) ("Any 'missing links' in the chain of custody are supplied by the presumption of regularity which attaches to business records.")

Tunnell's second challenge is much more compelling. As Tunnell was merely the passenger in the vehicle driven by Athey, Tunnell questions the relevance of his pre-accident consumption of alcohol. Tunnell argues that his blood alcohol level is not relevant to any issue in this case and is unduly prejudicial under Fed.R.Evid. 403. In this warranty case, Ford asserts that the manner in which the Mustang was driven constituted unforeseeable misuse. But Tunnell was not the driver, and there is no evidence whatsoever of the level of blood alcohol of Athey, the driver. Tunnell contends that because collisions are foreseeable and because consumption of alcohol by passengers in a vehicle is foreseeable, the issue of unforeseeable misuse is not implicated by Tunnell's consumption of alcohol. As regards the liability issues in this case, there is no substantive reason for the introduction of expert testimony regarding Tunnell's blood alcohol level. Tunnell was not the driver, and as such his blood alcohol level is irrelevant to the issue of foreseeable misuse or any other liability issue. Indeed, Ford conceded at argument that Tunnell's blood alcohol level is not relevant to how the accident happened.

Despite this concession, Ford asserts that Tunnell's consumption of alcohol is relevant to his perception of the accident and the origin of the fire. Ford contends that what Tunnell felt, remembered and perceived is directly influenced by his level of alcohol consumption and that Valentour's opinion is necessary to impeach Tunnell's testimony in that regard. For example, Tunnell testified that he was not smoking at the time of the accident despite having his window cracked, and Ford contends that Tunnell's intoxication calls into

question his recollection as to what he was doing at the time of the accident. Ford argues therefore that Tunnell's testimony necessarily will open the door to the accuracy of his recollection which was impacted by the level of his alcohol consumption. Tunnell counters by stating that it will not offer any testimony from Tunnell as to how the accident happened, and that for any such testimony, Tunnell will be Ford's witness whose credibility and perception Ford may not impeach by introducing the evidence of his blood alcohol level. In this regard, Tunnell's argument is inconsistent with Fed.R.Evid. 607 which states that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness."

Ford also contends that Tunnell's level of intoxication on the night in question also is relevant to damages as plaintiff's expert may state that Tunnell has become an alcoholic as a result of the accident. Tunnell indicates that he will not make such an argument or raise such an element of damages. As Tunnell is not claiming that Ford is responsible for any alcohol dependence Tunnell may have experienced as a result of this accident, his blood alcohol level at the time of the accident is not relevant to the issue of damages in this case. *See DeWald v. King,* 233 Va. 140, 354 S.E.2d 60 (1987).

In sum, Valentour's opinion, while scientifically sound, is not relevant to any liability or damages issue and may be introduced solely to impeach Tunnell's testimony as to how the accident happened. As the Court will be required to weigh the probative value of this evidence against the prejudicial effect of this testimony under Fed.R.Evid. 403, this critical balance is properly reserved for determination at the time of trial.

**V. John Habberstad's opinion as to the speed of the 1999 Mustang GT at the point of impact is admissible provided that the data from the restraints control module on the test and accident vehicles is substantially similar.**

 Ford intends to introduce the expert engineering opinion of John Habberstad for two purposes. Habberstad crash tested two 1999 Mustangs in a manner that Ford contends is substantially similar to the accident involving Tunnell. The purpose of Habberstad's crash test was to estimate the speed of the vehicle driven by Athey at impact. Habberstad crashed one Mustang at 40 mph and another at 45 mph in March, 2003 and opines from comparison of these collisions to the Athey/Tunnell collision that the likely speed of the 1999 Mustang GT was 40–45 mph when it hit the pole. Secondarily, Ford expects to have Habberstad testify that in neither of his tests did the electrical system of the crash test vehicles catch on fire. Ford expects to ask the jury to find based on these tests that the electrical system was not the culprit in the post-collision fire.

Tunnell argues that Habberstad's crash tests are not substantially similar because the impact point of both crashes is slightly to the rear of the crash point involving the Athey vehicle, leaving the wiring harness in the dashboard intact. Tunnell also argues that in neither accident did Habberstad remove the dashboard of the vehicle to see whether the wiring harness was damaged. Without doing so, Tunnell argues, there is no way to determine whether the Habberstad crash tests truly are substantially similar to the Athey/Tunnell accident. Finally, Tunnell points out that Habberstad does not profess to offer a fire origin opinion or have any knowledge of the wiring system of a Mustang.

The case law on the introduction of crash tests requires that the tests be substantially similar. "Admissibility of evidence depends upon a foundational showing of substantial similarity between the tests conducted and actual conditions." *Ramseyer v. General Motors Corp.*, 417 F.2d 859, 864 (8th Cir.1969). Perfect identity between experimental and actual conditions is not required. *Id., United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir. 1992). In *Chase v. General Motors*, 856 F.2d 17, 20 (4th Cir.1988), the Fourth Circuit noted:

> In products liability cases, expert witnesses necessarily may play a significant part .... When their testimony, however, is based upon the results of tests which were conducted under such different circumstances than those obtaining at the time of the accident complained of so as to make the results 'largely irrelevant, if not misleading,' [citing *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1051 (4th Cir.1984)], that testimony must be excluded.

A salient problem with the Habberstad tests is that there is no empirical comparison of data from the actual and test crashes. Tunnell argues that there is no way to determine at present whether the Habberstad crash tests are substantially similar because Ford has not provided sufficient data from the restraints control module in the crashed vehicles to ascertain whether the change in velocity (Delta–V) in the crash test is the same as that in the Athey vehicle.[2] Habberstad conceded at deposition that comparison of this data between the test and Athey/Tunnell Mustang should be made. Habberstad testified: "Well, sure, we need to look at it.

We need to look at—we need to understand both the actual vehicle and the tests." Habberstad Dep. at 8–9. Without this comparative data, all the jury is left with are photos of the physical damage from the two crash tests, one at 40 mph, and one at 45 mph, without knowing whether these speeds, chosen by Habberstad for his tests, reflect the speed of the Athey/Tunnell vehicle when it impacted the pole. Ford suggests that the fact that the tests are substantially similar is evident from photos of the three Mustangs placed on their sides showing the angle of impact. While that is true to some extent, the point of Habberstad's experiment was to determine the speed of the Athey/Tunnel vehicle at the point of impact, and merely picking two speeds and comparing the results of crashes at those speeds is little more than an educated guess. Indeed, there is no way of knowing whether a crash test at 25 mph or 55 mph would result in the same or similar damage to a Mustang.

While Habberstad opines that his two crash tests are substantially similar to the Athey/Tunnell collision, there is no way for the court and jury to accurately assess the validity of this claimed similarity except by rough approximation. While the side view photos of the three Mustangs appear similar, the only way to confirm whether the same forces were involved in the test and actual crashes is to compare the Delta–V data from the test and Athey/Tunnell vehicles.

To the extent that the Delta–V data from the Habberstad crash test is substantially similar to that recovered from the Athey vehicle, the results of the Habber-

---

**2.** At the hearing on June 23, 2004, Tunnell requested certain data from the restraints control module in one of the Habberstad test vehicles which was not available in a form allowing comparison to the Athey/Tunnell ve-

hicle. As a result, the court required Ford to use its best efforts to obtain the data from the manufacturer of the restraints control module at Tunnell's expense so that the data can be compared.

stad crash test may be admitted. If the Delta–V data is not substantially similar, then the forces involved in the accident and the test are different enough to render the crash test inadmissible. Thus, a final decision on the admission of Habberstad's tests and opinion necessarily awaits the results of the Delta–V data comparison.

### VI. Tunnell's challenge to Ford's Vocation and Rehabilitation Expert H. Gray Broughton is without merit as Tunnell's concerns bear on the weight of the evidence as opposed to admissibility; therefore Broughton's opinion testimony is admissible.

 Tunnell asserts that the testimony of Ford's vocation and rehabilitation expert, H. Gray Broughton, should not be admitted at trial and alleges that Broughton forms his opinions on a basis of scientifically unreliable facts and flawed methodology. However, Tunnell's brief in support of the exclusion of Broughton essentially complains about the conclusions Broughton reaches rather than the analytical basis of methodology that Broughton employed in reaching them.

Broughton bases his opinions on a large number of reliable documents pertaining to Tunnell which are listed on pages 3–4 of his report as well as several texts of scientific relevance listed on page 4. Broughton also explains his methodology in forming his opinion on page 4 of his report, and Tunnell makes no direct complaint about the approach taken by Broughton.

Tunnell alleges that Broughton does not take into consideration Tunnell's functional and mobile limitations in suggesting career options for him, but this is simply not the case. Broughton carefully examines in his report the extent of Tunnell's injuries and the rehabilitative measures taken to treat them. Broughton addresses the fact that, as a result of the accident, Tunnell suffers lasting limitations and requires special considerations in choosing a career. Broughton suggests careers for Tunnell based upon all of these factors and Tunnell's relative learning ability in the fields of mathematics and reading comprehension.

Tunnell alleges incorrectly that Broughton assumed Tunnell's wages would remain constant in the future at the pre-crash level, and that Broughton did not determine what Tunnell's earning capacity was before the crash. In fact, Broughton merely gives examples of jobs that Tunnell could perform with his current limitations that would yield him an income comparable to that he enjoyed before the crash and the possibility of greater future earnings as his skills and knowledge improved. Further, Tunnell's own brief states that, as Tunnell had done previous to the crash, "many young adults do not have well-defined career choices and enter the labor market on a trial-and-error basis" which serves to illustrate how difficult it would be to accurately determine what Tunnell's earning capacity was before he had decided upon his career path. Plaintiff's brief at 3; *quoting* Deutsch and Sawyer, A Guide to Rehabilitation, § 6.04 (1997).

As such, Tunnell does not illustrate any actual flaw in Broughton's methodology or the texts upon which he relied. Instead, Tunnell's argument is that because Broughton's conclusion is flawed, his methodology must be flawed as well. The accuracy of Broughton's conclusions is for the jury to decide and his testimony should therefore be admitted at trial.

### CONCLUSION

For these reasons, it is recommended as follows:

- The fire cause and origin opinions of Andrew Neuhalfen and Ralph Newell be admitted; except that neither may offer

opinion testimony or tests concerning the ignition of flammable alcohol as the source of the fire as there was no evidence that there was any such alcohol in the 1999 Mustang GT.

• The opinions of Victor DeClercq as to the lack of electrical arcing evidence and the significance of the absence of such evidence be admitted along with his factual testimony concerning Ford and the industry's historic use of battery disconnect devices prior to 1999.

• The consumer expectation opinion of Eric Dahlquist be excluded as it lacks any semblance of reliability.

• The opinion of James Valentour as to the level of alcohol in the blood of plaintiff Tunnell be admitted for impeachment purposes only, and then only after an appropriate Rule 403 balance at the time of trial based on Tunnell's testimony.

• The opinion of John Habberstad as to the speed of the 1999 Mustang at the point of impact may be admitted provided that the data from the restraints control module on the test and accident vehicles is substantially similar.

• The opinion of H. Gray Broughton should be admitted as Tunnell's concerns go to weight of his testimony, and not admissibility.

The Clerk is directed immediately to transmit the record in this case to the Hon. Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.